IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| NORTH IDAHO COMMUNITY ACTION NETWORK, | ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL No. 08-181-N-EJL |
| Plaintiff, | | MEMORANDUM ORDER |
| vs. | | |
| ANTHONY J. HOFMANN, U.S. ARMY CORPS OF ENGINEERS' WALLA WALL DISTRICT; *et al.*, | | |
| Defendants. | | |

Before the Court in the above-entitled matter are the parties' cross-motions for summary judgment and the Plaintiffs' motion to expedite. The matters are ripe for the Court's consideration. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, these motions shall be decided on the record before this Court without oral argument. Local Rule 7.1(d)(2)(ii).

**Factual and Procedural Background**

The Plaintiffs, William R. Lewis and North Idaho Community Action Network (collectively "NICAN"), challenges the Defendant United States Army Corps of Engineers ("Corps")[1] decision issuing a Clean Water Act ("CWA") section 404 permit to the Defendant Idaho Department of Transportation ("ITD") to discharge, dredge, or fill material into waters of the United States for purposes of construction of the Sand Creek Byway Project ("Byway Project") in Sandpoint, Idaho. Specifically, NICAN challenges whether the Corps "complied with § 404 of the CWA when issuing a permit approving ITD's plans to dredge and fill Sand Creek in order to construct the Sand Creek Project." (Dkt. No. 21, p. 2). NICAN has filed the instant motion seeking declaratory relief and to enjoin the Defendants from authorizing and/or commencing any activities relating to the construction of the Sand Creek segment of the US-95 Sandpoint North-South Highway Project ("the US-95 Project"). (Dkt. No. 21). The Project was also involved in another case filed by NICAN in this district, <u>North Idaho Community Action Network v. United States Department of Transportation, et al.</u>, Case No. CV05-273, alleging violations of the National Environmental Policy Act ("NEPA") and the Department of Transportation Act ("DTA").

NICAN originally brought this suit in the United States District Court for the Eastern District of Washington. (Dkt. No. 1). The Eastern District of Washington Court granted the ITD's motion to intervene as a Defendant and granted the Defendants' motion to transfer venue to this District. (Dkt. Nos. 1-4). NICAN then filed a motion for temporary restraining order and preliminary

---

[1] Also named as a Defendants are Anthony J. Hoffman in his official capacity as District Commander, U.S. Army Corps of Engineers' Walla Walla District, Steven R. Miles, in his official Capacity as Commander and Division Engineer, U.S. Army Corps of Engineers' Northwest Division, and Robert Van Antwerp, in his official capacity as Commander and Chief Engineer, U.S. Army Corps of Engineers. The Court will refer to all of these Defendants collectively as the "Corps."

MEMORANDUM ORDER 2

injunction. (Dkt. No. 21). The Court issued an order denying the TRO and setting a briefing schedule for the motion for preliminary injunction. (Dkt. No. 23). Thereafter, the Court granted the parties joint motion to consolidate briefing which converted the motion for preliminary injunction to a motion for summary judgment. (Dkt. Nos. 24, 25). The Defendants then filed their cross-motions for summary judgment. (Dkt. Nos. 29, 30). The Court now takes up the pending motions and finds as follows.

## Standard of Review

**I.      Summary Judgment:**

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Summers v. A. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997). Federal Rule of Civil Procedure 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party  (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund, 882 F.2d 371, 374 (9th Cir. 1989) (citation omitted). Of course, when applying the above standard, the court must view

all of the evidence in a light most favorable to the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Hughes v. United States</u>, 953 F.2d 531, 541 (9th Cir. 1992).

**II.    <u>Administrative Review</u>:**

When reviewing agency decisions under the Administrative Procedures Act ("APA"), an agency action can be "overturned only where it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" <u>Great Basin Mine Watch v. Hankins</u>, 456 F.3d 955, 961-62 (9th Cir. 2006) (quoting 5.U.S.C. § 706(2)(A)).  An agency decision is arbitrary or capricious if: 1) the agency entirely failed to consider an important aspect of the issue; 2) the agency offered an explanation for its decision that was counter to the evidence before it; 3) the agency relied on factors that Congress did not intend for it to consider; or 4) the agency's decision is so implausible that it could not be ascribed to the product of agency expertise.  See <u>Northwest Ecosystem Alliance, et al. v. Rey, et al.</u>, 380 F.Supp.2d 1175, 1184 (W.D. Wash. 2005); <u>see also</u> <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).

In making this determination, the Court "may not consider information outside of the administrative record... and may not substitute our judgment for that of the agency."  <u>Id.</u> (citations and quotations omitted).  "Our task is simply to ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."  <u>Id.</u> (citations and quotations  omitted); <u>see also</u> <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971) (The reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.").  "Within this narrow review, [the court] cannot substitute [its] judgment for that of the [agency], but instead must uphold the agency decisions so long as the agencies have 'considered the relevant factors and articulated

a rational connection between the facts found and the choice made." Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944, 954 (9th Cir. 2003) (citation omitted).

Under the arbitrary and capricious standard of review, "our proper role is simply to ensure that the [agency] made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" Lands Council v. McNair, 537 F.3d 981, 993 (9th Cir. 2008) (citations omitted). "This approach respects our law that requires us to defer to an agency's determination in an area involving a 'high level of technical expertise.'" Id. at 993. "[T]his approach also acknowledges that [w]e are not free to 'impose on the agency [our] own notion of which procedures are 'best' or most likely to further some vague, undefined public good.' Nor may we impose 'procedural requirements [not] explicitly enumerated in the pertinent statutes.'" Id.

**Analysis**

I. **The Project**

The US-95 Project near the city of Sandpoint, Idaho was proposed to address serious traffic congestion and traffic flow problems on US-95 in the Sandpoint area and to provide a non-stop facility between Sagle and Ponderay for through trucks and others not intending to stop in Sandpoint. (AR 3085). On September 9, 1999, the final environmental impact statement ("FEIS") was issued for US-95 Project. (AR 2020-2500). In the FEIS, US-95 Project consisted for four segments: Sagle to Long Bridge, Long Bridge Widening, Sand Creek Byway, and Sandpoint to Kootenai Cut Off Road.

On May 23, 2000, the Federal Highway Administration ("FHWA") and ITD issued a record of decision ("ROD") for the US-95 Project which selected the "Sand Creek Two-Lane Alternative" as the chosen alternative for the Sand Creek segment of the US-95 Project. (AR 2501). This was

the preferred alternative in the FEIS. (AR 2053-56). On April 15, 2005, ITD released a revised environmental assessment ("EA") that made changes to the selected alternative as it was outlined in the FEIS. (AR 3073-3176). These changes are to occur in the Sand Creek Byway segment and include: (1) building a southbound off-ramp at the south interchange of the Sand Creek Byway Project; (2) adding an auxiliary southbound lane to the proposed highway; (3) building a shoreline extension of the east shoreline of Sand Creek; (4) building a continuous bridge over Sand Creek; (5) building an embankment to support a future railroad track; (6) setting the pedestrian/bicycle pathway at ten feet in width and located on the east shoreline of Sand Creek; (7) building a pathway habitat enhancement plan at three locations along the east shoreline of Sand Creek; and (8) building a north loop on-ramp. (AR 3094-99). Because many of these changes involve dredging Sand Creek, ITD submitted a CWA section 404 permit application to the Corps for the Sand Creek Byway Project. (AR 381-499).

The Corps provided public notice of the CWA section 404 permit and received public comments on the application. On September 21, 2007, the Corps released its Permit Evaluation and Decision Document ("Decision Document") (AR500-584) and, on October 3, 2007, issued the section 404 permit (the "Permit"). (AR585-658). The Permit authorizes the placement of fill into a total of 11.05 acres of open waters of the United States and wetlands. (AR 501). The Permit also provides for 6.73 acres of wetlands mitigation to compensate for the impacts of the fill and three HEAs adjacent to Sand Creek which total 3.24 acres. (AR 537-38). NICAN has brought the instant action to challenge the Corps' decision to issue the Permit.

NICAN's challenge is mainly based on the Corps' alleged failure to consider and select four less damaging practical alternatives to the Sand Creek segment of the US-95 Project. In particular,

NICAN points to: the two-lane alternative, an alternative without a pathway, a pathway along Lake Pend Oreille or through-town, and an alternative without three HEAs or fewer/smaller HEAs. The Corps and ITD contend that these alternatives were considered but were appropriately determined to be impractical given the Corps determination of the US-95 Project's purpose and, therefore, not selected. (Dkt Nos. 28, 30).

## II.     Project Purpose

The section 404 permitting process is governed by Congressional guidelines, the Section 404(b)(1) Guidelines (the "Guidelines"), and the Corps' own regulations (the "Regulations"). See 33 U.S.C. § 1344(b)(1); 40 C.F.R. Part 230, and 33 C.F.R. Parts 320-330. A section 404 permit cannot be issued under the Guidelines where "there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). To be "practicable," an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). For non-water dependent projects that involve discharges into "special aquatic sites," such as wetlands which exist in this case, the Guidelines dictate a presumption that "practicable alternatives that do not involve special aquatic sites" are available "unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). The practicability of a project alternative is evaluated "in light of overall project purposes," as determined by the Corps. 40 C.F.R. § 230.10(a)(2).

The Corps and ITD determined that the project's purpose here is to "alleviate traffic congestion and improve traffic safety on US 95 in the downtown Sandpoint area by constructing a

MEMORANDUM ORDER            7

non-stop facility that will accommodate anticipated traffic for the next 20 years (until 2024) and provide enhanced bicycle and pedestrian facilities." (AR 504); (Dkt. No. 30, p. 8). In determining this purpose, the Corps made its own independent judgment while taking into consideration the support of local government. See 33 C.F.R. § 320.4(j)(2) (in considering permit applications, the Corps considers that "primary responsibility for determining zoning and land use matters rests with state, local and tribal governments. The district engineer will normally accept decisions by such governments on those matters unless there are significant issues of overriding national importance."); (AR 504, 4228, 4352).

Here, NICAN argues the Corps improperly failed to consider and select one of four less damaging practicable alternatives to the Sand Creek segment including:

1. The Sand Creek two-lane alternative;
2. The Sand Creek segment without the pathway;
3. The Sand Creek segment with the pathway along Lake Pend Oreille or through-town;
4. The Sand Creek segment without the three artificial HEAs or fewer and smaller HEAs.

(Dkt. Nos. 21, 31). The Corps maintains that it considered all practicable alternatives as required by the Guidelines and Regulations.

## III. The Corps Consideration of Alternatives

### A. The Sand Creek two-lane alternative

The Corps contends this is not a practicable alternative because it does not include a bicycle/pedestrian pathway and, therefore, does not satisfy the purpose of the US-95 Project.[2] (Dkt

---

[2] ITD argues the amount of acres impacted from the project are not significant when compared to other cases where a substantially larger number of wetland acres are impacted. (Dkt. No. 30, pp. 17-18). The Court does not find this type of comparison between cases to be overly compelling. Each case and each project are different and should each be evaluated on their merits.

MEMORANDUM ORDER 8

No. 28, p. 20-21). Pointing to the May 2000 ROD, which considered this alternative (AR 2501), NICAN argues that this alternative "includes a pathway as well as other amenities to enhance bicycle and pedestrian facilities along the US-95 Project corridor." (Dkt. No. 31, p. 1).[3] The Corps counters that the "two-lane alternative contained no evaluable, detailed plans for enhancement bicycle/pedestrian facilities" in the ROD and only the subsequent EA, that rejected the two-lane alternative, provided any "actual plan" for bicycle/pedestrian facilities. (Dkt. No. 32, p. 2). Even if the pathway is included in this alternative, the Corps maintains that it fails to satisfy the Project's purpose of alleviating traffic congestion and improving traffic safety in downtown Sandpoint.

The May 2000 ROD states: "Overall, the project will maintain or improve public recreation opportunities in Sandpoint. It will not eliminate any existing facilities and will enhance pedestrian/bicycle recreation by connecting the Long Bridge and City Park area to new paths and to bike lanes extending north to the SH-200 junction." (AR 2506-07). Having reviewed the Administrative Record and the parties' briefing, the Court finds that the Corps properly considered the two-lane alternative and ultimately determined it was not practical as it failed to satisfy the purpose of the US-95 Project. Following the issuance of the 2000 ROD and FEIS, which selected the two-lane alternative, a revised EA was issued that evaluated changes and additions to the alternative to better address the purpose of the US-95 Project both in terms of the downtown Sandpoint traffic issues and the bicycle/pedestrian pathway. (AR 3084-86). The revised EA ultimately selected the revised alternative as the preferred alternative over the two-lane alternative selected in the ROD and FEIS. (AR 3086). Further, the two-lane alternative has been deemed

---

[3] NICAN's opening brief raised different arguments regarding the two-lane alternative in that it avoided impacts on aquatic resources and habitat, had less impact on wetlands, and a lower overall cost. (Dkt. No. 21, pp. 6-8). These arguments are similarly unsuccessful and the two-lane alternative is impracticable since it does not address the purpose of the Project.

MEMORANDUM ORDER 9

logistically impracticable and has been rejected by the agencies leading the efforts at planning and designing the US-95 Project. (AR 3094-99). It is appropriate in this case for the Corps to rely upon the NEPA analysis of the practicable alternatives given the Corps active participation in the NEPA process of the Project. See 40 C.F.R. § 230.10(a)(4); (AR 541, 2009-2019); (Dkt. No. 30, p. 13). In addition, the Corps undertook their own Guidelines analysis of the practicable alternatives beyond those already considered in the NEPA analysis as is discussed in the Decision Document. (AR 522-28).

Further, the alternative does not address the purpose of the US-95 Project in terms of traffic issues in downtown Sandpoint nor for enhancing the bicycle/pedestrian facilities. (AR 504). The Corps properly defined the purpose of the project and considered the alternatives in light of that purpose. (Dkt. No. 30, p. 11-17). Accordingly, the Court finds the Corps determination that the alternative is impracticable is appropriate.

### B.   The Sand Creek segment without the pathway

NICAN argues the Corps never considered building the Sand Creek segment of the US-95 Project without a bicycle/pedestrian pathway which would eliminate 20,930 cubic yards of fill into Sand Creek, reduce impacts to aquatic resources, and be less expensive. (Dkt. No. 21, p. 8). The purpose of the US-95 Project would still be met, NICAN asserts, as it would improve the traffic flow and provide a non-stop facility for traffic not intending to stop in Sandpoint. NICAN further contends that the bicycle/pedestrian pathway is only "one objective" of the US-95 Project but not "essential to the basic purpose of the US-95 Project." (Dkt. No. 21, p. 9 n. 10). The Corps and ITD disagree and argue that it deemed an alternative without a pathway is impracticable in light of the

MEMORANDUM ORDER                          10

Project's purpose. (Dkt. No. 32, p. 5) (Dkt No. 30, p. 20). The Corps maintains that the purpose of the Project includes providing "enhanced bicycle and pedestrian facilities." (AR 504, 544-45).

As stated above, the purpose of Project as defined by the Corps included the bicycle/pedestrian pathway. (AR 504). An alternative containing no such pathway is impractical as it fails to meet the project's purpose. The Court finds the Corps gave appropriate consideration to this alternative in light of the Project's purpose. In addition, the Corps disputes two argument raised in NICAN's reply brief that it manipulated the purpose of the project and that the Corps should have considered possible bicycle/pedestrian facilities beyond the Sand Creek path. The Court agrees with the Corps that raising new arguments in a reply brief is inappropriate. See Bazuaye v. INS, 79 F.3d 118, 120 (9th Cir. 1996). Regardless, the arguments are unsuccessful. NICAN argues the Administrative Record reveals that the Corps gave no consideration to removing the pathway. This argument, however, is contradicted by NICAN's own briefing which states that "[n]otably, on at least two occasions, the Corps recommended removing the pathway from the Project altogether in order to avoid impacts to Sand Creek" but that "FHWA...simply denied the request without further explanation" and "the FHWA outright refused to consider eliminating the pathway in order to avoid adverse impacts." (Dkt. No. 21, p. 9). FHWA's refusal to consider an alternative is not before the Court in this matter. This action challenges the conduct taken by the Corps. NICAN's own argument evidences that the Corps gave due consideration to removal of the pathway. (Dkt. No. 21, p. 9); (AR 4228, 4330, 7151-53); (Dkt. No. 30, p. 20). After undertaking such consideration, the Corps determined that the alternative was impracticable as it failed to satisfy the projects purpose. The Court concludes this consideration and decision by the Corps is

reasonable and connected to information contained in the Administrative Record. (AR 504, 4330, 4404-4579).

**C.     The Sand Creek segment with the pathway on Lake Pend Oreille or through-town**

NICAN faults the Corps for not considering placing the pathway along Lake Pend Orielle or through-town as a less damaging practicable alternative. Pointing to a March 15, 2007 letter from the Corps to ITD, NICAN argues the Corps failed to follow up on considering a less damaging alternative where the bicycle/pedestrian pathway would not follow the alignment of the new US-95 highway. Further, NICAN contends that such an alternative is consistent with the interests of the communities and the Sand Creek Conceptual Master Plan. The Corps counters that it raised these possible alternatives to ITD and rationally concluded that the alternative routes were not practicable.

The Court finds the Corps gave proper consideration to these alternative routes and had sufficient information before it to deem them impracticable because the routes had safety issues, had low rankings in the communities' priorities, and were logistically impracticable and would require acquisition of private property and easements. (AR 388-89, 504, 3787, and 5044). Though NICAN may disagree with the Corps determination, the Corps satisfied the requirements of the Guidelines and Regulations in its consideration of these alternatives. Because the alternatives were determined to be impracticable, the Corps was not required to determine the feasibility of and select the least damaging alternative. See Utahans for Better Transportation v. United States Department of Transportation, 305 F.3d 1152, 1188-89 (10th Cir. 2002). NICAN's reliance on the Corps' March 15, 2007 letter is unavailing as this letter was a request for additional information from ITD and letter itself evidences that the Corps considered alternative placements for the pathway including along Lake Pend Oreille and through downtown Sandpoint. (Dkt. No. 30, pp. 11, 21) (citing AR

MEMORANDUM ORDER                    12

4230). Though NICAN asserts that the letter shows the Corps did not consider the alternative because ITD did not respond to the request, ITD's permit application had already provided an analysis of both alternative routes. (Dkt. No. 30, p. 22) (citing AR 388-89).

### D. The Sand Creek segment without the three HEAs or fewer/smaller HEAs

NICAN argues the Corps failed to consider building the Sand Creek segment without three HEAs or fewer/smaller HEAs. Although the HEAs are mitigation for discharges into Sand Creek from the project construction, the construction of the HEAs themselves requires the discharge of additional fill into Sand Creek resulting in the additional losses of aquatic habitat. (AR 3122, 4230). An alternative without HEAs or fewer/smaller HEAs should, NICAN contends, be considered as practicable because it would be cheaper, feasible, reduce the aquatic losses, and satisfy the overall purpose. (Dkt. No. 21, p. 12-13). The Corps argues that it considered alternatives to the HEAs including culvert improvements, removing fill in other locations, mitigation banking, and mitigation in Taylor pond. (Dkt. No. 32, p. 11) (citing AR 4228, 4230). These alternatives were rejected as impracticable in light of the project's purpose. (Dkt. No. 32, p. 12) (citing AR 527, 4357-58, 4370-71, 4513-14); (Dkt. No. 28, pp. 25-26) ("As mitigation for the open-water fill needed for the path, only the HEAs contribute towards the Byway's purpose of enhancing pedestrian and bicycle facilities."). The Corps further notes that "the HEAs are valuable on-site compensatory mitigation that will increase habitat functionality in a disturbed system." (Dkt. No. 28, p. 26).

NICAN challenges the Corps' position arguing their duty is to first avoid discharges of dredged and fill material whenever practicable, not mitigate for impacts that are avoidable. (Dkt. No. 31, pp. 12-13). NICAN points to the section 404(b)(1) Guidelines which require that the Corps first avoid discharges of fill whenever practicable, stating: "no discharge of dredged or fill material

MEMORANDUM ORDER 13

shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). NICAN points to the Guidelines regarding non-water dependent projects that requires the Corps to presume that practicable alternatives are available unless clearly demonstrated otherwise. See 40 C.F.R. § 230.10(a)(3). NICAN asserts that the issue is not whether alternative forms for HEAs are practicable but whether the project should be build without HEAs or fewer/smaller HEAs. (Dkt. No. 31, p. 12 n. 7). NICAN also contends that the Corps has not articulated why this alternative is impracticable.

The Court has reviewed the Administrative Record, including the portions cited to by the parties, and concludes that the Corps acted in accordance with the Guidelines and Regulations and the record supports the Corps' determination that this alternative is impracticable. The Corps determined the impacts of the Project could not practicably be avoided and, therefore, took steps to minimize the potential adverse impacts as required by its Regulations, 33 C.F.R. 320.4(r)(1). (Dkt. No. 32, p. 11). As determined above, the purpose of the Project includes a bicycle/pedestrian pathway. (AR 504). The Sand Creek pathway cannot practically be located elsewhere and, therefore, the impacts on the wetlands are unavoidable and must be mitigated. (AR 388-8-, 3787, 5044).[4] The Regulations require compensatory mitigation to replace aquatic resource functions that are unavoidably lost by permitted activities. See 33 C.F.R. § 320.4(r)(1); 33 C.F.R. § 325.4(a)(3). The HEAs are not themselves amenities of the Project but are instead required mitigation efforts necessitated by the impact of the Project on the wetlands. (AR 539).

---

[4] In addition, ITD notes that substantial efforts were taken to avoid and minimize the project's impacts to wetlands and waters of the United States including: an offsite mitigation area, use of construction techniques, realignment of the pathway and reduction of the pathway's width, and the selection of the pathway's location. (Dkt. No. 30, p. 10, 16) (citing AR 664, 4448-51, 389).

MEMORANDUM ORDER 14

The Guidelines allow the Corps to utilize "planning and construction practices to institute habitat development and restoration to produce a new or modified environmental state of higher ecological value by displacement of some or all of the existing environmental characteristics." 40 C.F.R. § 230.75(d). The Administrative Record, reveals that the alternative selected by the Corps will result in a greater number of acres of new wetlands than the acreage of wetlands lost. Further, the impacted open water habitat of Sand Creek are already disturbed by a flood control dam and the shoreline is not considered a high value aquatic resource area. (Dkt. No. 28, p. 26) (citing AR 4358); (Dkt. No. 30, p. 18) (citing AR 503, 538, 4467-96); (Dkt. No. 30, p. 25). As such, the HEAs will result in an overall improvement to the wetland habitat which is consistent with the Guidelines which allows for habitat enhancement that produces a "modified environmental state of higher ecological value by displacement of some or all of the existing environmental characteristics." 40 C.F.R. § 230.75(d). As such, the Court finds the Corps' determination that this alternative is impracticable is reasonable based on the Administrative Record and consistent with the Guidelines and Regulations requirements.

## IV.    Conclusion

The Court has considered the parties' arguments and Administrative Record in this matter and concludes that the Corps did not act arbitrary, capricious, or abused its discretion, or otherwise act not in accordance with law. Great Basin Mine Watch v. Hankins, 456 F.3d 955, 961-62 (9th Cir. 2006) (quoting 5.U.S.C. § 706(2)(A)). The Corps issued its Decision Document after having considered the relevant factors and important aspects of the project. The Decision Document provided an explanation for the Corps' decision based on the record and evidence before it and

articulated a conclusion that evidences a rational connection between the facts found and the choices made by the Corps. The Court finds the decision reached by the Corps to be appropriate.

The Corps properly defined the project's purpose and evaluated the practical alternatives and considerations appropriate to render its decision in light of that purpose. In doing so, the Corps complied with the applicable Guidelines and Regulations. The Administrative Record establishes that the Corps considered all practical alternatives before it and even explored additional alternatives from those considered during the NEPA process for the US-95 Project. The issues and alternatives raised by NICAN were either considered by the Corps or were impracticable in light of the project's purpose. As such, the Court will grant the Defendants' motions for summary judgment and deny NICAN's motion.

## ORDER

Based on the foregoing and being fully advised in the premises, the Court HEREBY ORDERS as follows:

1) Plaintiffs' Motion for Summary Judgment (Dkt. No. 21) is **DENIED**.

2) Defendants' Cross-Motions for Summary Judgment (Dkt. Nos. 29, 30) are **GRANTED**.

3) Plaintiffs' Motion to Expedite (Dkt. No. 34) is **MOOT**.

DATED: **April 21, 2009**

Honorable Edward J. Lodge
U. S. District Judge